[Civ. No. 61420. Second Dist., Div. Five. Nov. 25, 1981.]

HILLEL CHODOS, Plaintiff and Respondent, v.
INSURANCE COMPANY OF NORTH AMERICA, Defendant and
Appellant.

**COUNSEL**

Brill & Hunt, Marshall T. Hunt, Horvitz & Greines, Ellis J. Horvitz and Gerald H. B. Kane, Jr., for Defendant and Appellant.

Hillel Chodos, in pro. per., for Plaintiff and Respondent.

## OPINION

**RALPH, J.\***—Insurance Company of North America (hereinafter INA), a corporation, appeals from a judgment rendered to its insured following a jury verdict of $205,146.71: $200,000, punitive damages; $5,000, emotional distress; and $146.71, compensatory damages.

Appellant, INA, contends as follows:

1. Evidence is wholly insufficient to establish the essential elements of plaintiff's claims.

2. The judgment is grossly excessive and is the product of passion and prejudice.

3. Trial court committed the following errors of law: (a) Instructing that punitive damages could be awarded not only for fraud per se but also for "fraudulent breach" of the obligation of good faith and fair dealing; (b) instructing that punitive damages could be awarded for "fraudulent violation" of section 790.03, subdivision (h), of the Insurance Code; (c) failing to instruct that punitive damages must bear a reasonable relation to compensatory damages; (d) failing to instruct the jury that corporate liability for punitive damages depended on more than mere existence of an employer-employee relationship; (e) instructing on the fraud cause of action; (f) instructing by giving BAJI Nos. 2.02, 2.04 and 2.22; (g) admitting evidence of the Lewin claim.

Respondent, insured, contends that the judgment should be affirmed. We agree.

### BACKGROUND

In October 1975, respondent had an automobile insurance policy with appellant, INA, which covered him and his family, including three teen-age children living in the family home, two of whom were driving at that time. This policy, obtained through INA's agent, Protected Insurance Agency (hereinafter Protected), contained a provision under "Bodily Injury and Property Damage Liability Coverage," that ". . . the insurance with respect to a temporary substitute automobile or non-owner automobile shall be excess insurance over any other valid and collectible insurance."

*Assigned by the Chairperson of the Judicial Council.

Also, this policy provided under "Conditions," that "In the event of an accident, occurrence or loss, written notice containing particulars sufficient to identify the Insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the Insured to the Company or any of its authorized agents as soon as practicable ... [¶] The Insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for such immediate medical and surgical relief to others as shall be imperative at the time of the accident."

Also, in 1975 INA utilized an appraiser's procedure manual which read, in part: "[T]he objectives of the organization are: To reduce the dollars paid out on automobile physical damage and property damage claims.... and to improve service to INA insureds and claimants through the selection, training and supervision/monitoring of appraisers in an assigned region. [¶] His/her key objective, be he/she approved independent or staff appraiser, is to reduce the dollars paid out on automobile physical damage claims by writing the lowest reasonable appraisal upon which an agreed repair price can be obtained. [¶] The writing of an appraisal, that represents the lowest reasonable agreed repair price obtainable, constitutes the most important function of the appraiser. It is his/her special skill which can and must contribute toward affecting a reduction in the dollars paid out on automobile physical damage and property damage claims."

On October 27, 1975, respondent learned that his son, Michael, had been involved in an automobile accident in a 1969 Alfa Romeo belonging to an Edward DeJong. The accident occurred when Michael backed out of the stall in the Beverly Hills High School parking structure, without looking, and collided with a 1972 Mercury Capri, driven by another student, Neil Brourman.

Shortly thereafter, the mother of the minor driver of the Capri contacted respondent to report the matter and ascertain what respondent planned to do about the matter. She was not very clear whether her son was injured.

Within the next few hours or the following day after the accident, respondent contacted Kathleen Powers, a personal lines underwriter at Protected, who suggested that he call INA directly and speak with the claims manager, Harry Iversen. Powers' notes of this conversation show

a date of November 6, 1975, but she testified that it was not always her custom and practice to put down the date that a conversation took place, and, actually, that she could not remember independently of her notes in the file any specific telephone conversations between her and respondent.

Respondent, thereafter, telephoned the owner of the Alfa Romeo to report the mishap and learned that the owner's car insurance had been "dropped."

After the conversation with the Alfa Romeo owner, respondent attempted to reach the claims manager at INA but was unable to do so at first. Within the next few days following the accident, however, respondent did discuss the situation with Iversen, claims manager at INA, and outlined his apprehensions about a personal injury suit being brought by the Capri driver. Respondent suggested that it would be desirable for both respondent and appellant to avoid such a suit by a fast "settlement." Iversen saw merit in that position, according to respondent, and finally agreed that respondent could "settle" the matter for property damage only, provided (1) if the owner of the Alfa Romeo did turn out to be insured with primary coverage, INA would be "off the hook"; (2) if respondent paid "too much" to have the Capri repaired, appellant would not reimburse respondent; and (3) respondent would have to arrange a visit for an INA appraiser to see the vehicle. Iversen, however, recalled absolutely nothing of the events which led to the creation of a file concerning the accident herein—except he did recognize his own handwriting. In the INA file, however, a note in December 1975 from Iversen to an INA adjuster who requested "advise" read as follows: "No way, shop will repair the damage for agreed. His problem. He paid too much. *I warned him it would happen....*" (Italics added.)

The mother of the minor, Mrs. Brourman, obtained on or about November 3, 1975, two estimates—one from Beverly Hills Lincoln-Mercury Body Shop in the amount of $424.68 and the other from Paulee Body Shop for $407.72. On November 7, 1975, respondent sent to the parents of the minor driving the Capri a check in the amount of $407.72, enclosing a settlement letter which he requested they sign and return; this they did.

On or about November 11, 1975, respondent sent the signed settlement letter to Powers at Protected, requesting that the settlement letter

and release and two estimates be sent to INA so that he could be reimbursed.

Approximately 10 days later he received a letter from INA signed by a Wanda Fong, an insurance adjuster, who requested an explanation as to why the claim was not reported promptly and that an "investigation was being conducted." Respondent telephoned Ms. Fong and outlined the conversations with Ms. Powers at Protected, and with Iversen at INA, and according to respondent, was told by Fong to "ignore the letter."

Fong did not recall such conversation and did not recall anything about this claim until she had been given portions of the INA file (some had been misplaced inadvertently) by appellant's attorney prior to the trial. This file revealed, according to Fong's notes, that on November 11, 1975, Fong spoke with Powers at Protected and had been given information about the time, place and participants in the accident of October 27, 1975, name of insured, names of owners of cars, a reference to the repair estimate of $407.72 which had been paid by respondent, and his request for reimbursement. Immediately thereafter Fong notified a Kay Goodwillie to assign an appraiser to inspect the car, which assignment of appraiser was made by Goodwillie on November 12, 1975. Also, on November 12, 1975, the file revealed that Fong did have a telephone conversation with respondent who told her the address of the owner of the Alfa Romeo and the name of the company through which the Alfa Romeo was financed.

An appraisal in the amount of $261.01 by a Leon Munos from Beverly Hills Lincoln-Mercury (which also had given to Mrs. Brourman the estimate for $424.68) dated November 13, 1975, reached the INA file by November 17, 1975. The appraisal from Beverly Hills Lincoln-Mercury in the amount of $261.01, obtained by Leon Munos, contained a notation from Munos which read "Beverly Lincoln could not find their estimate but agreed to appraisal by seeing picture." This procedure "surprised" Fong.

On November 20, 1975, Fong received a communication from Sally W. Smith, claims desk at Protected, which contained a letter from respondent and both the $424.68 estimate from Beverly Hills Lincoln-Mercury and the one from Paulee Body Shop for $407.72.

Fong, despite the activity reported commencing November 11 and the phone call of November 12, sent out a letter dated November 20, 1975, to appellant which read, in part: "Your report of this claim has just been received. Please send us your explanation as to why it was not promptly reported." Information regarding alleged failure of respondent to report promptly was not requested during the telephone conversation between respondent and Fong on November 12, 1975, nor during respondent's conversation with Powers on November 11, 1975. But, according to Fong, when she learned the difference between the appraiser's figure of $261 and the amount paid out by respondent of $407.72, she wanted to investigate the delay.

According to Fong, her "thinking process" was that "[n]ormally on claims that are over 250 an appraiser would go out and look at the car and the *insured wouldn't admit any liability* on the insured's part *until* the insured's company would get a contact with the insured or the claimant." (Italics added.) And "... it states in the policy that it should be reported within 48 hours to the insurance company or to the agent." Further, in answer to the question by counsel, "... you were trying to figure out possible defenses that you could make if I demanded the 407, correct?" Fong responded, "Possibly."

Fong did not recall any conversation with respondent in connection with the letter of November 20, 1975, and did not recall that there was any communication from Iversen; but the file revealed a note to Fong, dated November 24, 1975, from Iversen in which Iversen does indicate respondent telephoned him regarding the accident and reported that he (respondent) did not wish to wait and that "... he [respondent] would be doing so at his own risk. We would investigate and notify him of the results. I did not say we would pay. H.I."

On December 5, 1975, according to the INA file, Fong verified that the insurance coverage on the Alfa Romeo had lapsed, and on December 8, 1975, she sent a disposition letter to the agent Protected, indicating that $261.01 was paid respondent and that the file was being closed.

When respondent received the $261.01, he telephoned Fong, requesting an explanation of why he had not received $407, rather than $261. Fong did not remember this conversation but according to respondent, Fong told him that INA had received a firm commitment from a rep-

utable body shop to do the repair for $261.01, therefore, that was the "reasonable amount" and that's all INA would pay. Respondent then pointed out that the body shop who gave the commitment was also the one which had given an estimate of $424.68 to fix the car, but Fong did not wish to discuss this difference further. She did, however, agree to send a copy of the $261.01 estimate from Beverly Hills Lincoln-Mercury, which she did. Fong did, according to her file (but she did not remember), send a note to Iversen regarding this second estimate not being an "agreed price" and reported that respondent wanted "his $424.68."

Respondent, after receiving the estimate in mid-December 1975, contacted Charles Lahr, Jr., at the Beverly Hills Lincoln-Mercury Body Shop to see why one body shop would make, within a two-week period, two different estimates. Lahr explained that the first estimate was done by an employee who actually saw the car, but that the second was done by Lahr based on a picture brought in by a Leon Munos. Lahr, according to respondent, explained that he had an understanding with the representative of INA, Munos, that if the car actually came in and it turned out there was more work required than appears from the sheet and the Polaroid picture, that his deal with Munos was that he could always call Munos and Munos would come by and pay the balance. Lahr testified that his understanding with Munos or any appraiser for whom he estimated with pictures only was that if something were missed that, another estimate would be made. Also, Lahr pointed out that there were items for repair on the first estimate by Beverly Hills Lincoln-Mercury Body Shop which were *not* contained on the second one obtained by Munos for INA, and that he could *not* testify that $261.01 was a reasonable cost. Leon Munos, the appraiser for INA, verified that it was his understanding with Lahr that if Lahr found additional damage or some omission or *difference between the actual price of repair and the estimate*, that there would be an adjustment made.

Thereafter, respondent telephoned Iversen and discussed with him the previous conversation, events subsequent, and that the reason asserted for not giving him the right amount he had paid out was not a true cost based on information which respondent had learned from the Beverly Hills Lincoln-Mercury Body Shop. But when Iversen telephoned him after "[l]ooking into the matter," according to respondent, Iversen reported that they had a "firm estimate for $261.01 and that it was respondent's own fault for paying too quick."

Respondent, after the mid-December message from Iversen, contacted INA to speak with their "main lawyer," Eric Lamont, who advised respondent to call Dave Smith. Respondent then called Dave Smith who had been sent a memo regarding this situation on December 6, 1975, and they discussed respondent's problem and the meaning of "firm commitment" and "agreed price" and how it had been applied in the situation with Kurt Lewin, another insured of INA. Smith said he would call back, but he never did. Thereafter, respondent called Lamont again reporting his conversation with Smith, and Lamont said he would look into it and call respondent back but he never did. On December 21, 1975, respondent sent Lamont a letter, to which there was no response. Lamont testified that he had no recollection of ever speaking with respondent or of having received the letter addressed to him at INA.

The INA file does reveal a note to Kathy Brown, dated January 9, 1976, from Iversen requesting a statement of fact from the appraiser (Munos) regarding his instruction on the agreed price. Such a statement was recorded over the telephone on January 9, 1976. And, on January 30, 1976, a copy of respondent's summons and complaint was received by the Los Angeles claims office from the San Francisco claims office. And, on February 4, 1976, a note from Iversen to Dave Smith reads, in part: "Policyholder requests exemplary damages. As such, we must send it to home office before we handle. Any comments? File is in good shape. Harry Iversen."

At the trial, Robert L. Piper, former manager of the claims department for INA, testified that, claims documents were sent to Philadelphia and certain information would be keypunched into the computer but that it was not possible to ascertain comparative information about situations involving claims wherein agreed commitments were less than the amount actually spent for the claim. Also, he testified that four months after a file was closed in Los Angeles it was shipped to Philadelphia and thereafter destroyed physically.

The jury, after a seven-day trial and three days of deliberation, found that an obligation arose between plaintiff and defendant which required defendant to reimburse plaintiff the amount of $407.72 and damages were awarded totalling $205,146.71. Thereafter, defendant brought both a motion for new trial and motion for judgment notwithstanding the verdict, both of which were denied.

DISCUSSION

Issue I

*Whether Evidence Is Sufficient to Establish the Essential Elements of Plaintiff's Claims*

■ It is true, as appellant contends, that a judgment must be upheld on appeal in the face of a challenge to the sufficiency of the evidence if it can be said that the judgment is supported by substantial evidence. (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429·[45 P.2d 183].) The test, however, is not whether there is substantial conflict, but whether there is substantial evidence in favor of the respondent. If this "substantial evidence" is present, no matter how slight it may appear in comparison with the contradictory evidence, the judgment will be affirmed. In brief, the appellate court ordinarily *looks only at the evidence supporting the successful party, and disregards the contrary showing.* (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 249, p. 4241.)

If the evidence is in conflict, the appellate court will not disturb the verdict of the jury because it is presumed correct. The presumption being in favor of the judgment the court must consider the evidence in the light most favorable to the prevailing party, giving him the benefit of every reasonable inference, and resolving conflict in support of the judgment. (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 248, p. 4240.)

The conflicting evidence rule does not permit weighing of the evidence or reversal of a judgment in accordance with the preponderance thereof. A judgment against the weight of the evidence will be affirmed, absent prejudicial error, if there is substantial evidence in support of it. (6 Witkin, Cal. Procedure, (2d ed. 1971) Appeal, § 248, p. 4240.)

Further, the testimony of a single witness, even the party himself may be sufficient. (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 248, p. 4240.)

A. Compensatory Damages

■ Utilizing these criteria, we turn first to whether there is a sufficient basis to uphold the award for compensatory damages.

In his first amended complaint respondent pleaded in the alternative four causes of action: contract, fraud, breach of covenant of good faith and fair dealing and violation of Insurance Code section 790.03, subdivision (h).

Exclusive of the punitive damages issue the jury was instructed that plaintiff had the burden of proof to prove *all* of the following issues: (1) An obligation to reimburse; (2) the proper amount of any obligation; (3) defendant breached the obligation of good faith and fair dealing implied in the relationship that existed between plaintiff and defendant; (4) defendant engaged in an unfair and deceptive act or practice with respect to plaintiff and his claim; (5) the nature and extent of his damages, if any, resulting from such alleged wrongful conduct in Nos. 3 and 4 above.

Also, the jury was instructed that the definition of emotional distress includes "anxiety, worry, humiliation and indignity."

Respondent, as an insured of appellant, was a party to a contract of adhesion, which has been defined as a standardized contract which is drafted and imposed by the party of superior bargaining strength which relegates the subscribing party only the opportunity to adhere to the contract or reject it. (*Steven* v. *Fidelity & Casualty Co.* (1962) 58 Cal.2d 862, 882 [27 Cal.Rptr. 172, 377 P.2d 284].)

█ In every insurance contract there is an implied covenant of good faith and fair dealing in which the insurer's duty is *unconditional* and *independent* of the performance of plaintiff's contractual obligations. (*Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 575 [108 Cal.Rptr. 480, 510 P.2d 1032].)

█ We are not unaware that one of the provisions in the policy confined the insured to making voluntary payments only in emergencies. We are entitled, however, to accept that the jury believed respondent's testimony as to his conversation with Iversen on the day of, or within a day or so after the accident, wherein it was "agreed" that respondent could "settle the matter for property damage" subject to certain conditions, one of which was that respondent should not pay "too much" to have the Capri repaired. Such an agreement, given the special relationship between insurer and insured, is sufficient to negative the ban on most voluntary payments.

We are also entitled to believe the jury accepted respondent's testimony that, on or about November 11, 1975, he (respondent) sent the signed settlement letter to the agent of appellant INA and the two estimates for reimbursement. Thereafter, Fong of INA knew that he had sent INA two repair estimates, one for $424.68 and, from the same body shop, another appraisal in the amount of $261.01.

Obviously, the jury could and did draw an inference from INA's failure to investigate, as respondent did, the difference between appraisals from the same place. The jury also was entitled to infer from the testimony of both Munos, INA's appraiser, and Lahr, Beverly Hills Lincoln-Mercury Body Shop, that these "estimates" were adjustable.

In connection with the settlement of the claim for damage done to the Capri, INA's best interests were identical to those of respondent: to avoid a lawsuit by settling expediently and economically. Respondent attempted to do this, relying on Iversen's representations, and paid off the claim and got the releases from Brourmans, parents of the minor driver of the Capri.

Thereafter, INA had a duty to "give the interests of the insured at least as much consideration as it gives to its own interests." (*Crisci v. Security Ins. Co.* (1967) 66 Cal.2d 425, 429 [58 Cal.Rptr. 13, 426 P.2d 173].)

From INA's failure to investigate the disparate claims, and its representations ·to respondent that there was a "firm commitment" for $260.01 (which was not true), and that it was "respondent's own fault for paying too quick," the jury, with little difficulty, could conclude that INA had not done its duty and therefore had breached the covenant of good faith and fair dealing, and was therefore liable for "all detriment resulting from such violation, including mental distress." (*Silberg v. California Life Ins. Co.* (1974) 11 Cal.3d 452, 460 [113 Cal.Rptr. 711, 521 P.2d 1103].)

The jury heard testimony from respondent regarding his mental distress in connection herewith.

■    According to *Crisci v. Security Ins. Co., supra*, at page 430, "Liability is imposed not for a bad faith breach of the contract but for *failure to meet the duty to accept reasonable settlements*, a duty included within the implied covenant of good faith and fair dealing. ...

recovery may be based on *unwarranted rejection* of a reasonable settlement offer and that the *absence of evidence, circumstantial or direct, showing actual dishonesty, fraud, or concealment is not fatal* to the cause of action." (Italics added.)

■ It follows, therefore, that, excluding from consideration the other causes of action, there is sufficient evidence in the record to sustain the jury's decision solely on the basis of breach of implied covenant of good faith and fair dealing and accordingly uphold the judgment as it pertains to compensatory damages.

### B. Punitive Damages

■ In determining whether there is substantial evidence to support the award of $200,000 punitive damages, first, we must ascertain the requirements of a punitive damage award.

At the time of trial herein, Civil Code section 3294 read: "In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant."

Civil Code section 3294 was interpreted in *Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, at page 922 [148 Cal.Rptr. 389, 582 P.2d 980]: "'In order to justify an award of exemplary damages, the defendant must be guilty of oppression, fraud or malice. (Civ. Code, § 3294.) He must act with the intent to vex, injure, or annoy, or with a conscious disregard of plaintiff's rights. [Citations.]'" And, also on page 923, footnote 6, the court in *Neal* says: "It is true that the record contains no *direct* evidence that defendant, in pursuing the course of conduct that it did, acted with the indicated motivation and intent. However, as we said in *Bertero* [*Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 66 (118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878)], the requisite state of mind, often referred to as 'malice in fact,' may be proved 'either expressly (by direct evidence . . .) or by implication (by indirect evidence from which the jury may draw inferences). . . ." *Neal*, which also dealt with a situation involving breach of implied covenant of good faith and fair dealing, shows that the Supreme Court of California considers a finding of malice, express or implied, would be adequate to support an award for punitive damages.

■ Here, however, the lower court instructed that in order to award punitive damages, the plaintiff had to prove that: "Defendant was guilty of fraud, or defendant fraudulently breached the obligation of good faith and fair dealing implied in the relationship that existed between plaintiff and defendant, ..."

Although we do not believe it is necessary to show a "fraudulent breach of the obligation of good faith and fair dealing" for the reasons set out above, we do agree that a finding of fraud is sufficient to sustain a punitive damages award. Accordingly, we look for "substantial evidence in favor of the respondent" to support a finding of fraud upon which to base the punitive damages award.

The jury was instructed as to intentional misrepresentation, concealment and reliance. These instructions are the standard jury instructions found in California Jury Instructions, Civil (6th ed. 1977), designated respectively in BAJI Nos. 12.31, 12.35, 12.51 and 12.52. These instructions contain correct statements of the law and we must assume that the jury understood its charge in weighing the evidence for fraud.

Elements of misrepresentation and concealment proliferate in the file. Neither Iversen nor Fong told respondent that the $261.01 was adjustable; he ferreted this out for himself. INA's main lawyers, Eric Lamont and Dave Smith, explained nothing about the meaning of a "firm commitment" or "agreed price," although they were asked to explain.

INA representatives, Lamont, Iversen, and Fong, all testified that they do not recall specifically the events and that the only source of knowledge is the INA file. The INA file reveals that INA did not at anytime inform respondent of the appraisal practice of getting a "picture estimate" which was adjustable. Indeed, the contents of the file, as explained by Fong, show an awareness of a problem which is being covered up and prepared to be submitted to the home office, prior to a trial. Without any difficulty, the jury could infer that there was concealment and/or misrepresentation by one or all of the INA representatives, and that it was done intentionally.

Respondent relied upon Iversen's representations and conditions to settle the matter, and he paid the Brourmans for the property damage. He was not reimbursed for the money that he paid, and he spent much of his time and energies trying to get the matter in order—only to meet a stonewall. He was damaged thereby.

The only remaining inquiry is whether the actions or inactions of the INA employees bound INA so that punitive damages may be awarded against the employer.

Effective January 1981, Civil Code section 3294 was amended to read, in part: "... (b) An employer shall not be liable for damages pursuant to subdivision (a), based upon acts of an employee of the employer, unless the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice. With respect to a corporate employer, the advance knowledge, ratification, or act of oppression, fraud or malice must be on the part of an officer, director, or managing agent of the corporation...."

Prior to 1981, the rule on which the above amendment was based was set out in *Merlo* v. *Standard Life & Acc. Ins. Co.* (1976) 59 Cal.App. 3d 5, at page 18 [130 Cal.Rptr. 416]: "'While an employer may be liable for an employee's tort under the doctrine of *respondeat superior*, he is not responsible for punitive damages where he neither directed or ratified the act. [Citations omitted.] [¶] California follows the rule laid down in Restatement of Torts, section 909, which provides punitive damages can properly be awarded against a principal because of an act by an agent if, but only if "(a) the principal authorized the doing and the manner of the act, or (b) the agent was unfit and the principal was reckless in employing him, or (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or (d) the employer or a manager of the employer ratified or approved the act."'" (Citing *Hale* v. *Farmers Ins. Exch.* (1974) 42 Cal.App.3d 681, 690-691 [117 Cal.Rptr. 146].)

In the INA file are various documents from which it can be inferred that the decision made *not to pay* respondent, as promised, was not the decision of one employee only, e.g., a memorandum sent to Dave Smith, dated December 6, 1975, in which Mr. Wahrenbrock says in part, "... our position is very strong ..."; information regarding a recorded telephone conversation with appraiser Munos; and a note from Iversen to Smith which says, in part, "... we must send it [summons and complaint] to home office before we handle ... File is in good shape." Further, Iversen, the head claims manager at the Los Angeles office,

was functioning in a managerial capacity and had the right to make "final decisions" as to most claims processed here. Further, INA's choice to respond to the summons and complaint rather than settle the matter removes any doubt about "ratification" of the procedure utilized by the INA employees.

We, therefore, find there is sufficient evidence in the record to sustain the fraud cause of action and that the fraudulent acts of the employees were ratified by appellant.

## Issue II

### *Whether the Judgment Is Grossly Excessive and the Product of Passion and Prejudice*

In the motion for a new trial made by appellant below, one of the bases alleged was "excessive damages." Although the trial court's determination is not binding on the reviewing court, it is to be accorded great weight because of having been present at the trial, the trial judge was necessarily more familiar with the evidence. (*Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 64 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].)

Appellant contends that the verdict is excessive because respondent "harped upon INA's wealth." But, according to *Bertero* v. *National General Corp., supra*, at page 65, "... the wealthier the wrongdoing defendant, the larger the award of exemplary damages need be in order to accomplish the statutory objective. [Citations.]"

According to exhibits 15 and 16 received into evidence at the trial, INA's annual reports for 1978 and 1979 were before the jury. The 1978 report showed gross revenues in excess of $4 billion dollars, a net profit after taxes of $211,387,000, total assets of $12 billion and a net worth of $1,327,240,000. In 1979, the net profit after taxes was $261,637,000 and a net worth of $1,526,009,000.

If appellant paid the punitive damages award in one lump sum from the net profits after taxes of 1979, the remainder of the net profit would exceed $261 million. Using the *Bertero* standard, *supra*, pages 43 and 64, it does not appear that the statutory objective would be accomplished because of the comparative smallness of the award.

Another principal used to assess punitive damages is to view the "particular nature of the defendant's acts in light of the whole record; ..." (*Neal* v. *Farmers Ins. Exchange*, 21 Cal.3d 910, 928 [148 Cal.Rptr. 389, 582 P.2d 980].) That is, to say, that the "more reprehensible the act, the greater the appropriate punishment, ..." (*Id.*, at p. 928; citing *Bertero* v. *National General Corp., supra*, 13 Cal.3d 43, 65.)

Testing the record against the "particular nature" standard, we must inquire what the jury could have inferred from defendant's acts which merits the punitive damages award.

Instructions in the appraiser's procedure manual state that the objectives are "[t]o reduce the dollars paid out on automobile physical damage and property damage claims." A reference is made in the procedure manual that an objective is "to improve service to INA insureds and claimants through the selection, training and supervision/monitoring of appraisers in an assigned region."

How appraisers "trained to reduce dollars" are necessarily helpful to insureds is not clear. It is very clear how such appraisers are helpful to the insurer.

In addition to the complete record of the treatment of respondent, there was testimony at the trial by a Kurt Lewin who was having similar problems regarding the cost of estimates used to repair his vehicle at the same time respondent was having his difficulty.

From all evidence, the jury could infer that INA practiced cost-savings at the expense of its insureds. That is, using picture-appraisals to obtain the smallest possible estimates and designating this estimate as a "firm comitment," without regard to the quality of the repair, would produce cost-savings provided the insured did not object. This procedure doubtlessly saved money, swelled INA profits and disregarded the right of the insured to have a properly repaired car.

Thus, utilizing the foregoing criteria of assessment, we can not conclude as a matter of law that the award of punitive damages was excessive.

### Issue III

Appellant contends that certain errors of law were made by the trial court below, as outlined above.

We believe our discussion above has met objections outlined in appellant's contentions, either expressly or impliedly, and for that reason do not feel it necessary to address them further.

The judgment is affirmed.

Ashby, Acting P. J., and Hastings, J., concurred.

A petition for a rehearing was denied December 21, 1981, and appellant's petition for a hearing by the Supreme Court was denied March 25, 1982. Kaus, J., did not participate therein. Caldecott, J.,* participated therein. Mosk, J., Richardson, J., and Caldecott, J.,* were of the opinion that the petition should be granted.

---

*Assigned by the Chairperson of the Judicial Council.