[No. A040438. First Dist., Div. Five. July 12, 1989.]

In re the Marriage of LORENE SALMEN and IRA BIRNBAUM.
LORENE SALMEN BIRNBAUM, Appellant, v.
IRA BIRNBAUM, Respondent.

**[Opinion certified for partial publication.\*]**

\* Part II of this opinion is not certified for publication, as it does not meet the standards for publication contained in rule 976(b) of the California Rules of Court.

**COUNSEL**

Paula F. Schmidt for Appellant.

Lisa M. Dugoni and Greene, Chauvel & Dugoni for Respondent.

**OPINION**

**KING, J.**—In this case we hold that (1) when parents have joint physical custody of their children, an order modifying the coparenting residential arrangement does not constitute a change of custody; (2) the standard of appellate review of such an order is whether the trial court has exceeded the bounds of reason and abused the very broad discretion it possesses to make such orders; and (3) there was no abuse of discretion here.

Lorene Salmen Birnbaum appeals from an order modifying the living arrangements of the three daughters whose joint custody she shares with here former husband, Ira Birnbaum. We affirm.

In August 1983, pursuant to an agreement incorporated into their interlocutory judgment of dissolution of marriage, Lorene and Ira Birnbaum received joint legal and physical custody of their three daughters, then aged three, five and seven. One child was given a "primary residence" with her mother, another with her father, and the third to alternate yearly.[1] During

---

[1] "Primary residence" is not defined in either the agreement or the judgment. Indeed, since the agreement gives the parent providing the primary residence of a child the right to claim

the school year all three were to live with Lorene during the week and spend weekends and Wednesday afternoons with Ira.[2]

In September 1983, Lorene moved from the City of San Mateo, where the family had lived and the two older girls attended school, to "the Coast Side" of San Mateo County where the girls were enrolled in the El Granada elementary school.[3]

In August 1986, Lorene filed a motion to modify the existing order for joint physical custody, seeking sole custody and asking that Ira's Wednesday evening visits be eliminated and his school year visitation be limited to alternate weekends. In response, Ira moved for sole physical custody with reasonable visitation rights for Lorene. In his supporting declaration he objected to the existing situation because of the distance between San Mateo and El Granada and because "the schools there are inferior to the San Mateo Schools, especially at the middle and high school levels."

At the initial hearing on the motions, the parties agreed to undergo coparenting counselling which would result in an evaluation and recommendation by a psychologist they selected. In January 1987, the psychologist submitted a letter in which he praised both Lorene and Ira as parents, analyzed their individual strengths and weaknesses, and reported their continued difficulty in dealing with each other about the children.[4] Reluctantly—"much of this falls out of my area of professional expertise"—he proposed a two-year plan allowing each parent "very nearly equal time" with the children, including the opportunity for "quality time" as well as direct involvement in their schooling. In each four-week period Lorene would have the children weekdays and Ira would have them weekends for the first two weeks. Then they would live one week with Lorene, followed by one week with Ira. Wednesday evenings the children would dine with the parent with whom they were not then residing.

---

that child as a dependent for federal and state income tax purposes, it seems clear that the terminology of "primary residence," was used by these parties for tax purposes.

[2] Provisions for summer vacations and major holidays are not discussed here since they are not at issue on appeal. However, it is fair to say that they result in each parent having the children for approximately one-half those times each year. They are also very detailed, perhaps to the extreme, because the parents appear to be inflexible in dealing with each other.

[3] The area to which Lorene and her children moved and the local school system are variously referred to in both the briefs and the transcripts as Coast Side, El Granada, Cabrillo, and Half Moon Bay.

[4] This appears to be one of those rare joint physical and legal custody arrangements which functions by virtue of a highly inflexible schedule because, as the trial court told the parents, "you are so unable to communicate with each other." In its statement of decision the court stated: "Both parents love their children, yet neither can see past their particular egocentric needs to acknowledge the full value of the other parent to the children." One example of the parties' inflexibility is that Ira, because weekends were "his" time, refused to let the girls spend Mother's Day with Lorene. As we will discuss, this form of joint custody might be described as parallel parenting, as contrasted to shared or cooperative parenting.

At the hearing, the trial court heard testimony from Lorene, Ira and the psychologist. Lorene urged acceptance of the psychologist's proposal. Ira requested that the psychologist's proposal as to the scheduled time with each parent be reversed and the children reenrolled in the San Mateo City school system.

The court commented at length on the complementary characteristics of Ira and Lorene and fashioned an order "which it believes will allow both these parents to contribute the most positive sides of their personalities to their children in a balanced fashion," adopting, as requested by Ira, "as a general guideline the reverse of the plan set forth by [the psychologist]." For three out of each four weeks the children would reside with Ira during the week and spend weekends and Wednesday nights with Lorene. The fourth week they would reside with Lorene and spend the weekend and one night of her choosing with Ira. During summer vacations the schedule would be reversed. In its statement of decision the trial court incorporated several of the psychologist's written findings and found in addition that "Enrollment in the Schools of the City of San Mateo would provide the children with a greater variety of both educational and enrichment options than they presently enjoy." The provisions of the prior order for joint legal and physical custody of the children remained unchanged.

Lorene filed a motion for reconsideration accompanied by declarations from El Granada school personnel about the quality of the school system and the performance of the Birnbaum children therein. Over Ira's objection, the trial court found "the children had not been consulted or in any way had any input with the court," and held a 35-minute reported conference with them in chambers with the attorneys present. The trial court then denied the motion to reconsider and refused to stay its order pending appeal.

## I.

In their briefs the parties treat this as an appeal from an order modifying child custody. ■ "An application for modification of an award of custody is addressed to the sound discretion of the trial court, and its discretion will not be disturbed on appeal unless the record presents a clear case of abuse of that discretion." (*Messer* v. *Messer* (1968) 259 Cal.App.2d 507, 509 [66 Cal.Rptr. 417], citations omitted.) "Although precise definition is difficult, it is generally accepted that the appropriate test of abuse of discretion is whether or not the trial court exceeded the bounds of reason, all of the circumstances before it being considered." (*In re Marriage of Connolly* (1979) 23 Cal.3d 590, 598 [153 Cal.Rptr. 423, 591 P.2d 911], citations omitted.)

## A.

Lorene first asserts that there were no material changed circumstances sufficient to justify a change in custody. "It is settled that to justify ordering a change in custody there must generally be a persuasive showing of changed circumstances affecting the child." (*In re Marriage of Carney* (1979) 24 Cal.3d 725, 730 [157 Cal.Rptr. 383, 598 P.2d 36, 3 A.L.R.4th 1028].) The basic deficiency in Lorene's contention and her appeal from an order she claims changes custody is, whether there were changed circumstances or not, there has been no change of custody. The trial court ordered, "The parties shall continue to have and share joint legal and joint physical custody of their minor children," just as they did under the prior order. At most there has been a change in what the trial court termed the "co-parenting residential arrangement."

## B.

Next, Lorene asserts Ira failed to meet his burden of proof that the children's best interest required a change of custody. (Civ. Code, § 4600, subd. (b).) As pointed out above, there has been no change of custody, just a rearrangement of the children's residential timetable. The thrust of Lorene's argument in this regard seems to be that the trial court based its order on the superiority of the San Mateo school system and on Ira's qualifications to be the "school parent." She contends neither finding is supported by the evidence. "In fact," she suggests, "the evidence is contrary to such findings."

"There were, as is not unusual in a proceeding of this nature, conflicts both as to probative facts and as to the proper inferences to be drawn from such facts. But, as is true in all appellate reviews, and most emphatically in this type of controversy, it is not the function of this court to reweigh conflicting evidence and redetermine findings . . . . Our function has been fully performed when we find in the record substantial evidence which supports the essential findings of the trial court." (*Sanchez* v. *Sanchez* (1961) 55 Cal.2d 118, 126 [10 Cal.Rptr. 261, 358 P.2d 533].) "Further, the testimony of a single witness, even the party himself may be sufficient." (*Chodos* v. *Insurance Co. of North America* (1981) 126 Cal.App.3d 86, 97 [178 Cal.Rptr. 831].)

Ira testified as to the relative merits of the two school systems.[5] Recent newspaper articles cited the elementary school his two younger daughters would attend in the City of San Mateo as "one of two schools out of six thousand in the state to be named as an outstanding school." Ira had contacted the schools about extracurricular activities and comparative test

---

[5] Lorene did not object to this testimony either as hearsay or as inadmissible lay opinion.

scores. He was told that the Cabrillo school district in which the girls had been attending school was comparable to other "somewhat rural" districts, that is, it did not provide the educational diversity and enrichment available in the City of San Mateo school district.

He asked Cabrillo administrators if there were "elective courses and honor courses and special courses, academic mainly, and they said no." He asked "if she'll get music lessons, and things like that, and the answer was no." He offered in evidence four handbooks from San Mateo schools, which he said reported that "these schools are blessed with the adequate resources to provide extensive extracurricular and honor courses and music lessons . . . ." He explained that the availability of extracurricular activities at schools within walking distance of his house would allow the children to spend less time commuting and more time "perform[ing]."

Ira mentioned the advantages of a school environment where a large percentage of his daughters' peers would be college bound, and his own commitment to help them get a college education. He described the learning activities he shares with each of them, from playing number and letter Bingo and writing stories, to reading aloud, to composing school papers on his word-processor and discussing "politics and religion." He felt he encouraged academics more aggressively than did Lorene.

According to the psychologist, Ira has been involved in the girls' school work to an appropriate extent, but not so much as he would like to be, because they spend the school week at Lorene's. It has been difficult for him to participate in school functions because the school is so far away. He was concerned about their future education and felt the San Mateo high schools were better than those on the Coast Side.

Clearly, there was sufficient evidence to support the challenged comment and finding.

## C.

In its statement of decision, the trial court commented, "It is also troubling that Ms. Salmen unilaterally took the children from the environment where they had started their lives and their school careers without the opportunity for Mr. Birnbaum to have any input. It is hard to imagine an action that could have been more hurtful to Mr. Birnbaum." Lorene maintains this comment shows the purpose of the court's order was to punish her and redress a perceived injury to Ira. In light of the evidence, and the interest and concern displayed by the trial judge throughout this proceeding, and her carefully articulated four-page statement of decision, this allegation is ridiculous.

## D.

In actions to dissolve marriages it has become quite common to include requests for joint custody of children. It is doubtful that any two words mean as many different things to as many different people as the words "joint custody." The statutory definition, having to cover the wide variety of arrangements parents make when they have joint custody, is necessarily broad and does not provide much guidance.[6]

There seems to be a popular misconception that joint physical custody means the children spend exactly one-half their time with each parent. Such an arrangement, of course, leaves the child with no time of his or her own to spend with friends. It also elevates parental rights over children's rights and virtually treats the child as the parents' possession. It fails to take into account that the maximum personal growth and development of a child occurs from both a loving and supportive relationship within the family and the development of personal relationships outside the family. Parents' demands for equal amounts of a child's time constitute a disservice to the child, usually creating stress and preventing the child from fully achieving his or her potential. In some cases the nature of the relationship between the parents may necessitate this kind of inflexibility. Usually it is temporary, and when the former spouses have adjusted to their new and limited relationship as parents of the same children, mathematical exactitude of time is no longer necesssary. That has not occurred here.

Equal division of a child's time between the parents is not the hallmark of joint custody. After all, Civil Code section 4600, subdivision (b), provides "Custody should be awarded . . . according to the best interests of the child . . . ." Thus, the primary focus must be what is best for the child, not what is best for the parents. Although time is important to the parents, the determining factor as to whether joint physical custody is in the best

---

[6] Civil Code section 4600.5 reads in pertinent part: "(1) 'Joint custody' means joint physical custody and joint legal custody. (2) 'Sole physical custody' means that a child shall reside with and under the supervision of one parent, subject to the power of the court to order visitation. (3) 'Joint physical custody' means that each of the parents shall have significant periods of physical custody. Joint physical custody shall be shared by the parents in such a way so as to assure a child of frequent and continuing contact with both parents. (4) 'Sole legal custody' means that one parent shall have the right and the responsibility to make the decisions relating to the health, education, and welfare of a child. (5) 'Joint legal custody' means that both parents shall share the right and the responsibility to make the decisions relating to the health, education, and welfare of a child. (e) In making an order of joint legal custody, the court shall specify the circumstances under which the consent of both parents is required to be obtained in order to exercise legal control of the child and the consequences of the failure to obtain mutual consent. In all other circumstances, either parent acting alone may exercise legal control of the child. An order of joint legal custody shall not be construed to permit an action that is inconsistent with the physical custody order unless the action is expressly authorized by the court."

interest of the child is the nature of the parenting relationship between the parents.

In a presentation to the 1986 Annual Conference of the International Association of Family and Conciliation Courts, Isolina Ricci, Ph.D., stated: "For purposes of clarifying parenting relationships, I suggest four types of parenting patterns: exclusive, parallel, shared and cooperative. We could name more types of course (such as competitive or hostile) but today's illustration will be limited to these four types. The first type is a familiar one and called exclusive parenting. This is an exclusive role bound type of parenting, often typified in sole custody arrangements where one parent, usually the mother makes all the decisions, has all the responsibility and has all the authority. The parent without custody pays child support and commonly has visitation twice a month. Perhaps the noncustodial parent can give opinions regarding major decisions in education and medical treatment, but he or she may have no functional authority. When the parents are cooperative, and the child has consistent and continuing access to the other parent, this form of parenting can be successful. However, if the parent with custody is the 'in-house' parent, the parent without custody often considers his or her position as the 'out-house' parent, a 'visitor,' peripheral and powerless while the resident parent may feel overwhelmed and defensive. [¶] A form of parenting seen more frequently since the increase in joint custody, is what I call parallel parenting. Both parents are actively involved in the child's life, both have input into major decision making, but there is little or no interaction between them. Parents are unable or unwilling to discuss the children's needs with one another and their communications are strained or nonexistent. The parents will only contact one another in emergencies or in cases of illness. Children are not free to talk about what has happened to them in the other home—where they went, whom they saw. Children in such circumstances may even have to pretend that they do not have another parent and must choose their words carefully in the presence of each parent. Sometimes when a child spontaneously talks about something that's happened at the other home, the parent may say, 'I don't want to hear about it.' Because it is so difficult for both of them to be in the same room together, parents will often alternate attendance at school events. Rather than risk a scene or bad feeling, only one parent attends at any one time. Such parent may say 'It's too painful (or difficult) to talk to him/her or . . . 'I don't like her/him . . .' or 'I have nothing to say to him/her' or 'Everytime [sic] we talk, there's an argument' and often adding 'She/he takes it out on the child, or puts our child in the middle.' [¶] In such situations, the child may have two parents in two homes but may not feel at home or secure in either. One child in such a situation said, 'My safe home is the car.' Such parents do not share parenting, instead they divide it and they divide the child. Paradoxically, even with the more generous and

predictable time arrangement, parallel parenting is just the exclusive parenting problem all over again. For some families (and for some proponents of joint custody), joint custody has been operationalized as parallel parenting. [¶] When I have asked children how things are going for them or if a change would help, their answer is frequently something like the following—'No, keep it as it is . . . At least I have them both, even if it isn't the best.' Such children appear to fear that if only one parent had the lion's share of the authority or power, that parent would cut out the other parent causing the child to lose that parent. [¶] In contrast to this parallel parenting arrangement are two healthier forms. The first is what I call shared parenting, and the second, cooperative parenting. In both of these arrangements, parents do work together and support one another as parents. They might not love one another, but they've developed a business-like relationship as parents and can talk to one another about the child's needs and experiences. Parents can attend joint conferences and school events together. Teachers and coaches feel free to call either parent without risk of getting caught in parental competitiveness or territorial disputes. Children can share their lives with both parents and have open access by telephone to each parent. [¶] The difference between shared parenting and cooperative parenting is important to note. Shared parenting is a business-like working relationship as parents. Cooperative parenting builds on that working relationship with an additional spirit of forgiveness and easier give and take. [¶] Shared and cooperative parenting are the most desired forms of parenting after divorce by the child, by parents, and by the community at large." (Address, Mediation, Joint Custody and Legal Agreements: A Time to Review, Revise and Refine, by Isolina Ricci, Ph.D., and California's Coordinator of Family Court Services for the Administrative Office of the Courts, Association of Family and Conciliation Courts (AFCC) Annual Conf., Boston, May 22, 1986.)

We include Dr. Ricci's comments with the hope they will benefit not only the parties to this appeal, but also the bench and bar, and the general public. A better public understanding of the nature of joint physical custody is essential. Parents must understand that successful joint physical custody depends upon the quality of the parenting relationship, not the allocation of time. Parents must also understand that it is much harder to be a joint physical custody parent than a sole custody parent. Fully participating with the other parent to share the burden of cooperative or shared parenting for the benefit of the child is much more demanding than having sole physical custody or being a noncustodial parent.

Finally, we cannot conclude without expressing our distress that parents can be as inflexibile as Lorene and Ira when it comes to even slight adjustments in the time the children spend with each of them. As this case amply demonstrates, a point can be reached where parents, unwilling or unable to

communicate for the best interest of their child, call upon a judge to become super-parent and make parenting decisions the parents themselves cannot agree upon.[7] As a practical matter, if parents with joint physical custody are unable to modify residential arrangements for their children and call upon the court to do so, they have no basis to complain about the decision that is made. In such circumstances the court possesses the broadest possible discretion in adjusting coparenting residential arrangements involved in joint physical custody. The appellate court certainly cannot second-guess a *conscientious and competent trial court*, which has had the opportunity to observe the parents and the children personally. Thus a change of the joint custody residential arrangement cannot be reversed on appeal unless the trial judge has abused the very broad discretion he possesses in such cases, that is, has exceeded the bounds of reason.

II.*

. . . . . . . . . . . . . . . . . . . . . .

The judgment is affirmed.

Low, P. J., and Haning, J., concurred.

---

[7] The court acting as a superparent may well decide that the educational advantages offered by a particular school district justify residing in that district, just as parents themselves often utilize this factor in choosing a residence.

*See footnote, *ante,* page 1508.