Filed 6/27/14  M.R. v. Maria M. CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| M.R.,<br><br>    Appellant,<br><br>    v.<br><br>MARIA M.,<br><br>    Respondent. | H038102<br>(Monterey County<br>Super. Ct. No. PT1197) |

M.R. (Father) and Maria M. (Mother) have joint legal custody of their son (Child). When it was time for Child to start kindergarten, they could not agree on the choice of school.  Mother filed a motion asking the court to modify visitation and to order mediation or an assessment.  After an assessment was completed, the parties accepted the assessor's recommendations concerning a change in visitation, but still could not agree on the choice of school.  To resolve the school choice issue, the trial court held a two-day evidentiary hearing.  Neither party objected to the hearing.  After the hearing, the court ordered that Child attend Mother's choice of school.

On appeal, Father contends the court acted in excess of its jurisdiction when it made the school choice decision.  We conclude that Father has forfeited this contention because he failed to preserve the issue for appeal by objecting below.  We also hold that Father is estopped from raising this claim.  Since Father asked the court to act as "super-

parent" and to decide which school Child should attend, he cannot now complain that the court acted in excess of its jurisdiction because it did not agree with him.  Father also asserts that the court erred by applying the "best interests of the child" test rather than the "compelling circumstances" test when it decided that Child would go to Mother's choice of school, which was not the same school Child's half brother attended.  Finally, Father asserts the court abused its discretion when it made a number of evidentiary rulings.  We find no prejudicial error with regard to any of these claims and will affirm the court's order.

## FACTS AND PROCEDURAL HISTORY

Mother, who is from Mexico, came to Salinas in December 2004 and worked for Father as a live-in nanny for his then-five-year-old son from another relationship.  A few months later, the parties began an intimate relationship and Mother became pregnant.  She gave birth to Child in March 2006.  (We shall hereafter refer to Mother and Father jointly as "Parents," and to Father's son from a previous relationship as "Half Brother.")

In May 2006, when Child was two months old, Mother and Father had an argument while on a trip to Los Angeles.  As they argued, Mother scratched Father's face.  Father called the police and complained of domestic violence.  (Mother claimed she scratched Father after he rolled the car window up onto her neck.)  Mother was detained in the Los Angeles County jail for 36 hours.  While in jail, Mother told Father that if he did not want her or Child in his life, she might as well take Child and return to her family in Mexico.  Notwithstanding Mother's statement while in jail, on May 23, 2006, she returned to Father's house.  That same day, Father petitioned the court for a restraining order against her.

2

*Father's Petition, Mother's Response, and Initial Family Law Litigation*

Two days later, on May 25, 2006, Father filed a petition to establish a parental relationship with Child. Father asked for sole legal and physical custody of Child, with reasonable visitation for Mother. In a declaration, Father alleged that Mother was "arrested after assaulting [him]" and was "now in L.A. County Jail pending her release." Father had Mother served with summons and both petitions at his home on May 27, 2006.

On June 27, 2006, Mother responded to the petition. She disputed Father's allegations, and asked the court to award her sole legal and physical custody with reasonable visitation for Father. By that time, she was living in Pacific Grove. She had been away from Child "for more than a month," but had received some supervised visitation.

In July 2006, the court awarded Father sole legal and physical custody of Child, with supervised visitation for Mother. The court ordered an investigation by Family Court Services investigator James E. Fisher and a counseling assessment by Eduardo Eizner, MFT. The court vacated the restraining order it had issued, but ordered that Mother have no contact with Father.

In August 2006, Eizner reported to the court investigator regarding his assessment of Mother.[1] Eizner reported no mental illness, except that Mother appeared "mildly depressed at times—possibly due to the separation from her child, involvement with the legal system and disruption of her relationship." He also reported that Mother was "struggling with the separation from her son and fears that she will not be allowed to care for and raise him." Eizner opined that separation from Mother could have negative consequences for Child. Mother told Eizner she had wanted to take Child to Mexico if her relationship with Father did not work out because "she could provide a more stable

_____

[1] Eizner also evaluated Father, but that report is not in the record on appeal.

3

emotional and financial situation for [Child] in Mexico closer to her family." Eizner opined that Mother was a "loving and attentive care giver" for both Child and Half Brother.

During the first year of Child's life, the parties appeared in court six times. They disagreed about Mother's visitation timeshare, who should transport Child (Father had moved to Gilroy), who should supervise visits, what to feed Child, and the exchange of medical and health insurance information. In September 2006, the court ordered the parties to participate in co-parenting counseling.

In December 2006, court investigator Fisher reported that Parents were attending co-parenting counseling "on a fairly intense basis." Fisher stated, "Without a doubt, even with each side criticizing and 'nit-picking' each other, both of these people can provide good care for this child." Fisher opined that Mother had proven herself and it was time for unsupervised visits. He recommended that the court order joint legal and physical custody and refer the parties to mediation if they could not agree on visitation or holiday schedules.

In December 2006, Mother temporarily agreed that Father would continue to have sole legal and physical custody. In exchange, Mother would have unsupervised visitation, on the condition that she telephone Father periodically from a land line to confirm that she had not left Monterey County. The court made an order to that effect and referred the parties to mediation.

In March 2008, the court ordered an assessment by Kristin Orliss. Orliss recommended Parents have joint legal custody, but that Father would " 'continue to have sole custody over issues of residence and travel.' "[2] Father disagreed with Orliss's recommendations and an evidentiary hearing was held. The court's order after hearing is not in the record.

---

[2] Orliss's report is not in the record on appeal; our summary of her recommendations is based on other papers filed with the court.

As Child grew, the parties used court mediation services and appeared before the court to resolve a number of disputes, primarily involving the visitation schedule, transportation for visits, exchange points, holiday schedules, and child support. In July 2009, the court said this was a "high conflict" case, and observed that "the parties enjoy fighting more than they do sitting down and trying to agree for the benefit of their child."

In September 2009, the parties agreed to joint legal custody. The court ordered joint legal and physical custody and ordered the parties to continue their visitation schedule.

In July 2010, after mediation with Family Court Services, the parties agreed that Child should attend preschool. They could not agree on which preschool, so they enrolled Child in two different preschools, three days a week. By then, Mother had married and was living in the Toro Park neighborhood of Salinas. Father was living in Watsonville, and Child spent part of each week with each parent "on a nearly 50/50 schedule."[3] On Mondays and one Wednesday a month, when Child was with Mother, he went to a preschool in Salinas (Mother's Preschool); on Wednesdays and Fridays, when Child was with Father, he went to a preschool in Watsonville (Father's Preschool).

***Motions and Pre-trial Hearings Regarding School Dispute***

When it was time to enroll Child in kindergarten, Parents could not agree on the choice of school. Father wanted Child to go to Linscott Charter School (LCS) in Watsonville, a public, parent-participation school that Half Brother attended. Mother wanted Child to go to Toro Park Elementary School (TPS), a public school three blocks from her home.

---

[3] Child was with Father from Tuesdays at 1:30 p.m. through Saturdays at 8:30 a.m. and with Mother from Saturdays at 8:30 a.m. through Tuesdays at 1:30 p.m. Father also had Child the third weekend of every month. When Father had Child for the weekend, Mother had visitation through Thursday at 1:30 p.m.

On May 12, 2011, Mother e-mailed Father and asked if he would agree to go to mediation to discuss kindergarten. The next day, Father agreed in an e-mail to Mother, but Father's counsel did not respond to Mother's counsel's letters about the mediation. Sometime before June 1, 2011, Father enrolled Child in LCS.

On June 28, 2011, Mother filed a noticed motion to modify custody and visitation to enable Child to live with her and attend TPS. Mother asked for mediation and an assessment of the custody, visitation, and school issues, as she was "fairly certain" the parties would not come to an agreement. Mother requested that Orliss complete the assessment, since Orliss had done the assessment in 2008. Mother stated that she did not know where Father lived and that he had refused to give her his address. Mother's counsel served the motion on Father's counsel via hand delivery on June 28, 2011.

Neither Father nor his counsel filed papers in response to Mother's motion. And neither Father nor his counsel appeared for the July 22, 2011 hearing on the motion. The court clerk called Father's counsel during the hearing, but no one answered the phone.

The court ordered an assessment with Orliss. Mother's counsel advised the court that school started on August 24, 2011. The court continued the matter to August 19, 2011, to review the assessor's report, and suggested the parties complete the assessment by then. The court also ordered Father to provide his contact information to Mother and the assessor. After the hearing, Mother's counsel contacted Orliss to schedule the assessment. Orliss said she had a conflict and recommended Eizner do the assessment.

On July 26, 2011, Mother's counsel filed an ex parte application requesting various orders, including that (1) Eizner do the assessment; and (2) if the assessment cannot be completed by August 18, 2011, then Child would attend TPS pending further order of the court. Mother's counsel gave Father's counsel notice of the ex parte hearing via facsimile.

6

Neither Father nor his counsel attended the ex parte hearing on July 27, 2011.[4] At the hearing, Mother's counsel told the court that after she prepared the ex parte application, she learned that Eizner also had a conflict. The court ordered that the assessment be done by Julianne Leavy, MFT, and that if Leavy had a conflict, the court would appoint the next assessor on its list who did not have a conflict. The court also ordered that if the assessment report could not be filed by August 18, 2011, then Child would go to kindergarten "*only* at [TPS] pending further order of the court." (Original italics.)

Father appeared at the review hearing in August 19, 2011. He told the court that he was no longer represented by counsel and that he had filed a substitution of attorneys in April 2010. But there was no substitution of attorneys form in the court's file, and Mother's counsel had never received any such substitution filing. Mother's counsel reported that Leavy did not have a conflict, so she would be the assessor. Father objected to TPS. Father also argued that kindergarten was not mandatory at Child's age, but the court responded that it was "time for him to get enrolled in school." The court explained that parents typically go to mediation to resolve "these sorts of issues" or "if that's not feasible, . . . an assessor is appointed," and every effort would be made to maintain a joint timeshare. Father requested mediation. The court ordered the parties to attend mediation and if no agreement was reached, to then proceed with the assessment. The court also advised Parents that they both had the right to contest the assessment. Since school started the following Wednesday, the court made a temporary order that Child attend TPS.

On Friday, August 26, 2011 (the first school day that Child was with Father), Father did not take Child to school because he was volunteering at Half Brother's school (LCS) and could "not miss those workdays."

---

[4] Father later argued repeatedly that the ex parte order was obtained by "procedural trick" because Mother knew he was on vacation with Child on July 27, 2011.

On Monday, August 29, 2011, Mother made an ex parte application for an order, pending assessment, to change the visitation schedule. Mother asked the court to order that Child reside primarily with her to ensure that he gets to school, since Father failed to take him to TPS (or any other school) on August 26. Father appeared at the ex parte hearing and said he preferred to go directly to the assessment without mediation. Mother did not object.

The court ordered the parties to proceed with the assessment. The court also ordered that Child be with Mother from 5:00 p.m. on Sundays until noon on Fridays, plus one weekend a month, to make sure Child attends school at TPS pending the court's final order on which school Child would attend for kindergarten. The court also set a review hearing for October 7, 2011.

Leavy completed her assessment on September 28, 2011. She concluded that Child loves both parents very much and is securely attached to both. She reported that while Father agrees that both parents should be involved in raising Child, Father believes he is the more qualified parent and is more willing to co-parent than Mother. After speaking with "collateral contacts"[5] and meeting with Parents and the children, Leavy concluded that "although these parents are not good together they are, in fact, both excellent parents. They both seem to take . . . parenting very seriously and parent [Child] effectively. They both put a high standard on education." Leavy stated that TPS and LCS were "both excellent schools." But she recommended LCS "[based] on the relationship between brothers." Leavy described Child's relationship with Half Brother as "important" and opined that Child "will do better in school having his big brother with him." Leavy also opined that at Child's age, it is "important . . . he does not have

_____

[5] Leavy contacted a representative from the Family Services Center, a kindergarten teacher at LCS, a teacher at Mother's preschool, and Orliss. Leavy did not contact anyone from TPS, but testified that she was familiar with the school.

8

extended time away from either parent." She recommended an equal timeshare, suggested Parents exchange Child every three days, and proposed a visitation schedule.

At the review hearing on October 7, 2011, Mother accepted Leavy's recommendations regarding visitation, but not school choice; she wanted Child to continue at TPS. Father said he wanted Child to go to LCS. The court set the school choice issue for an evidentiary hearing on November 28, 2011. Neither party objected to the hearing.

In November 2011, Father obtained new counsel. On November 4, 2011, Father's counsel filed an ex parte application for an order directing Child to attend LCS, to keep the court's options open, on the ground that LCS could no longer hold a spot for Child. The court denied Father's request, reasoning that it was not in Child's best interest to change schools before the evidentiary hearing.

### *Evidentiary Hearing Regarding School Choice*

The court conducted a two-day hearing on the school choice issue on November 28, 2011, and January 10, 2012. The witnesses included Leavy, Robin Higbee (the principal at LCS), Carla Caballo (Child's kindergarten teacher at TPS), Debra Craig (Child's teacher at Father's Preschool), and Parents.

At the time of the hearing, Child was five years old and in kindergarten; Half Brother was 11 years old and in the sixth grade. LCS offered kindergarten through eighth grade classes, while TPS offered kindergarten through third grade classes.

Leavy's testimony was consistent with her assessment report. She said the major factor in recommending LCS was that Half Brother was there and it was important for siblings to know that they are at the same school. She relied on statements by an LCS teacher that the older students interact frequently with the younger students at LCS. But Leavy also testified twice that she was not an expert in school assessments.

9

LCS Principal Robin Higbee testified that LCS's racial make-up (a factor that was important to Father) was 57 or 58 percent Hispanic, 36 percent Caucasian, with the remainder African-American and Asian.[6] In her view, LCS provided an opportunity for children to be in an ethnically diverse environment and get a high quality education. Because LCS is a small school on a small property, siblings have opportunities to interact in the hallways, playgrounds, and classrooms. Sixth graders at LCS can choose to be classroom mentors (teachers' aides) as an elective for two 75-minute periods a week for one trimester. Higbee said LCS was still holding a spot for Child and there were 21 children in his class. Higbee also testified that moving a child who is established at a school can be traumatic for the child.

Child's kindergarten teacher, Carla Caballo, also testified. She had been a teacher for 26 years and had taught kindergarten at TPS for six years. She testified that Child arrived at TPS reading-ready, was in the top 10 percent of his class academically, and was adjusting well to kindergarten. Caballo said she would not recommend moving a child to another school unless there were compelling reasons.

Preschool teacher Debra Craig testified that Child was in her class at Father's Preschool, which shared the LCS campus. Father volunteered at the preschool on Fridays. Half Brother often came to Craig's classroom after school on Fridays; he and Child appeared to be closely bonded. Craig said both Father and Child thrived at the parent-driven concept at her preschool, which has a similar philosophy to that of LCS. Child appeared well-adjusted and had a large group of friends, many of whom transferred to LCS. Craig testified that the younger children at LCS did not play on the same playground as the older children.

Father testified that he was worried that his sons would lose their bond if they went to different schools. He said Half Brother had thrived at LCS and had done better

---

[6] Child is Hispanic.

there than at other schools.[7]  Father complained of difficulty arranging a meeting with Caballo to discuss some behavioral issues Child was having and that Caballo only had one volunteer per day in her classroom, whereas LCS had four volunteers per class each day.  On cross-examination, Father admitted that he had sent Half Brother to TPS for kindergarten because it had "higher test scores" and was the best school in Salinas.

Mother testified that Child did not have any behavioral problems during his first five weeks at TPS; problems started after Parents resumed the shared visitation schedule. Before choosing TPS, Mother researched LCS, visited LCS twice, and attended one of its board meetings.  At the board meeting, she learned that LCS had financial problems and planned to add a second kindergarten to address those problems.  Mother did not know whether adding a kindergarten class had resolved LCS's financial problems.  She thought the LCS classrooms were too small for 22 students, there were not enough computers, and the school was disorganized.

Mother testified that TPS is three blocks from her home and Child can walk or ride his bike to school.  Mother thought it was the better choice because it was bigger, with lots of space to play; it had new buildings and facilities, an excellent computer lab, and better test scores than LCS.  Mother said Child loved going to TPS and had lots of friends there.

TPS did not have a Spanish program; LCS offered Spanish classes after school for a fee.  Half Brother was learning Spanish at LCS and Father speaks Spanish to Half Brother at home.

***Trial Court Oder Regarding School Choice***

In its order after hearing, the court stated that "Child custody and visitation orders generally are modifiable throughout the child's minority whenever the court finds a

_____

[7]  By the time Half Brother was in the fourth grade, he had attended four different schools.

11

modification is 'necessary and proper' in the child's best interest. . . . Family Code § 3022.[8]  Since the parents cannot decide which school [Child] should attend, the court must step in to make this necessary decision."

The court granted Mother's request to continue Child at TPS.  The court found that "[b]oth schools are good schools.  [Child] by all accounts is strong academically.  The higher test scores of [TPS] suggest that [Child] would benefit from [TPS] academically.  Mother is perceived by the court to be in the best position to provide support and consistent follow up that [Child] will need at this stage of his academic career.  Mother, a native Mexican, can teach [Child] Spanish and expose him to Mexican culture.  [Child] spends three to four days a week with his stepbrother in his Father's home.  The evidence is lacking that the brothers, separated by six grades, would spend substantial time together at the same school."

## DISCUSSION

### *Standard of Review*

" 'The standard of appellate review of custody and visitation orders is the deferential abuse of discretion test.'  [Citation.]  Under this test, we must uphold the trial court 'ruling if it is correct on any basis, regardless of whether such basis was actually invoked.'  (*Ibid.*)"  (*Montenegro v. Diaz* (2001) 26 Cal.4th 249, 255 (*Montenegro*).)

"Under California's statutory scheme governing child custody and visitation determinations, the overarching concern is the best interest of the child.  The court and the family have 'the widest discretion to choose a parenting plan that is in the best interest of the child.'  (. . . § 3040, subd. (b).)  When determining the best interest of the child, relevant factors include the health, safety and welfare of the child, any history of

---

[8] All further unspecified code references are to the Family Code.

12

abuse by one parent against the child or the other parent, and the nature and amount of contact with the parents.  (§ 3011.)"  (*Montenegro*, *supra*, 26 Cal.4th at p. 255.)

*Jurisdiction*

Father claims the court committed reversible error because it "exceeded its jurisdiction by determining which school [Child] should attend."  He contends "[t]here is nothing in the Family Code that expressly or impliedly permits a court to make decisions regarding the education of a child" and that section 3022,[9] which was cited by the trial court, "only refers to custody—not the power to choose a child's education."  He argues that the Family Code impliedly delegates educational decisions to the custodial parents and that if the Legislature had intended to empower courts to make educational decisions, it would have done so expressly, as it has in the Welfare and Institutions Code for cases involving dependent children.  He also argues that the court's order infringes upon his fundamental right to control Child's education under the United States Constitution.

### General Principles Regarding Jurisdiction

The term "jurisdiction" has "so many different meanings that no single statement can be entirely satisfactory as a definition.  At best it is possible to give the principal illustrations of the situations in which it may be applied, and then to consider whether the present case falls within one of the classifications."  (*Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 287-288 (*Abelleira*).)  " 'When courts use the phrase "lack of jurisdiction," they are usually referring to one of two different concepts, although, as one court has observed, the distinction between them is "hazy."  [Citation.]  [Citation.]  A lack of jurisdiction in its fundamental or strict sense results in ' "an entire absence of

_____

[9]  Section 3022 provides:  "The court may, during the pendency of a proceeding or at any time thereafter, make an order for the custody of a child during minority that seems necessary or proper."

13

power to hear or determine the case, an absence of authority over the subject matter or the parties." ' "[10] (*People v. Lara* (2010) 48 Cal.4th 216, 224 (*Lara*), citing *Abelleira*, *supra*, at p. 288.)  "On the other hand, a court may have jurisdiction in the strict sense but nevertheless lack " 'jurisdiction' (or power) to act except in a particular manner, or to give certain kinds of relief, or to act without the occurrence of certain procedural prerequisites." [Citation.]  When a court fails to conduct itself in the manner prescribed, it is said to have acted in *excess* of jurisdiction.' " (*Lara*, at pp. 224-225.)

"The distinction is important because the remedies are different.  '[F]undamental jurisdiction cannot be conferred by waiver, estoppel, or consent.  Rather, an act beyond a court's jurisdiction in the fundamental sense is null and void' *ab initio*.  [Citation.]  'Therefore, a claim based on a lack of . . . fundamental jurisdiction[] may be raised for the first time on appeal.  [Citation.]  "In contrast, an act in excess of jurisdiction is valid until set aside, and parties may be precluded from setting it aside by such things as waiver, estoppel, or the passage of time.  [Citations.]" [Citations.]' [Citations.]" (*Lara*, *supra*, 48 Cal.4th at p. 225.)

We begin by observing that family courts are often called upon to make school choice decisions when parents with joint custody are at an impasse and cannot agree on the choice of school.  (See e.g., *Enrique M. v. Angelina V.* (2004) 121 Cal.App.4th 1371, 1374-1376 (*Enrique M.*) [parents could not agree on which school child should attend (a school near the mother's home or the school that the father's daughter from a prior marriage attended) and asked trial court to decide]; *In re Marriage of Adams & Jack A.*

---

[10]  For example, a state court lacks fundamental jurisdiction (1) "to determine title to land located outside its territorial borders, for the subject matter is entirely beyond its authority or power"; (2) "to adjudicate upon the marital status of persons when neither is domiciled within the state"; (3) "to render a personal judgment against one not personally served with process within its territorial borders"; (4) "to hear or determine a case where the type of proceeding or the amount in controversy is beyond the jurisdiction defined for that particular court by statute or constitutional provision." (*Abelleira*, *supra*, 17 Cal.2d at p. 288.)

14

(2012) 209 Cal.App.4th 1543, 1568 [observing that school choice issue was unlikely to be resolved absent capitulation by one parent, or intervention of a neutral third party *or the court*]; *In re Marriage of Birnbaum* (1989) 211 Cal.App.3d 1508, 1513-1514 (*Birnbaum*) [court ordered children to attend school in City of San Mateo (where father lived) rather than rural coastal community (where mother lived)]; *Cassady v. Signorelli* (1996) 49 Cal.App.4th 55, 61-62 [trial court order that child attend an appropriate public, private, or parochial school rather than be home-schooled by mother].)

We turn next to the question whether Father has forfeited his contention that the court exceeded its jurisdiction by failing to object on that basis below.

**Forfeiture**

Generally, a claim of error will be deemed to have been waived or forfeited when a party fails to bring the error to the trial court's attention by timely motion or objection, thereby preserving that issue for appeal.[11] (*People v. Simon* (2001) 25 Cal.4th 1082, 1103 (*Simon*); *Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 265-266.) The purpose of the general doctrine of waiver or forfeiture is "to encourage the [parties] to bring errors to the attention of the trial court, so that they may be corrected or avoided and a fair trial had . . . ." (*Simon*, at p. 1103, internal quotations omitted.) " 'No procedural principle is more familiar to [the appellate courts] than that a constitutional right,' or a right of any other sort, 'may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.' " (*Ibid.;* internal quotation marks omitted.)

---

[11] "Forfeiture" refers to a failure to object or to invoke a right, whereas "waiver" is the intentional relinquishment or abandonment of a known right or privilege. On occasion, the two terms have been used interchangeably. (*In re Sheena K.* (2007) 40 Cal.4th 875, 880, fn. 1.) Because the issue is whether Father's failure to preserve a contention in the trial court precludes him from raising it for the first time on appeal, we use the term "forfeiture" in analyzing the issue.

At the October 7, 2011 hearing, Mother told the court she accepted the assessor's recommendations regarding visitation, but not the choice of school. Father (who was self-represented at that hearing) also agreed with the timeshare recommendation, but said he wanted Child to attend LCS. Father asked the court why it was not following the assessor's recommendation regarding school choice; the court explained that both sides had a right to a hearing on the issue. Since the parties could not agree on the choice of school, the court set the matter for an evidentiary hearing. At that time, Father did not object, as he does on appeal, that the court did not have jurisdiction to make educational decisions.

The parties returned to court on November 4, 2011, on Father's ex parte application for an order directing Child to attend LCS. By that time, Father had retained new counsel. Father asked the court to order Parents to send Child to LCS because LCS had said that it could not hold a spot for Child until the evidentiary hearing on November 28, 2011. At the November 4 hearing, both Father and his counsel acknowledged that an evidentiary hearing on the school choice question was set for November 28; neither Father nor his counsel objected to that hearing.[12]

Throughout the two-day evidentiary hearing, the trial court repeatedly identified the issue that it was to decide as "where the child is going to go to school." Neither Father nor his counsel ever objected that the court exceeded its jurisdiction by deciding that issue. Father filed a trial brief and a 20-page post-trial brief, neither of which questioned the court's jurisdiction to decide the school choice issue.

In its January 2012 order after hearing, the court stated, "Father wants [Child] to attend school at [LCS] in Watsonville. Mother wants [Child] to attend [TPS] located outside of Salinas. The parties cannot agree and ask the court to decide. [¶] . . . Since

---

[12] Notwithstanding his assertions on appeal, at the November 2011 ex parte hearing, Father asked the court to make the same kind of school choice decision that he now claims the court lacked jurisdiction to make.

16

the parents cannot decide which school [Child] should attend, the court must step in to make this necessary decision." After receiving the court's order, Father did not object that the court did not have the power to decide the issue.

On this record, because Father failed to object below and thereby preserve the issue for appeal, we conclude that he has forfeited any claim that the court exceeded its jurisdiction when it decided the school choice issue.[13] As we explain next, Father is also precluded from challenging the court's decision on the grounds of estoppel.

**Estoppel**

"Under the doctrine of invited error, when a party by [his] own conduct induces the commission of error, [he] may not claim on appeal that the judgment should be reversed because of that error." (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 212 (*Mary M.*)) In other words, one who induces or invites error by the trial court is estopped from asserting it as a ground for reversal on appeal. (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403; see e.g., *Kristine H. v. Lisa R.* (2005) 37 Cal.4th 156 [where trial court had subject matter jurisdiction to determine parentage, parent who invoked that jurisdiction, stipulated to the issuance of a judgment, and enjoyed the benefits of the judgment, was estopped from challenging the validity of the judgment on appeal].) But the doctrine of invited error does not apply when a party, while making appropriate objections, acquiesces in the trial court's determination. (*Mary M.*, at p. 212.) As we

---

[13] A claim of error may be waived by express waiver or by acquiescence. A party who expressly agrees to an action taken by the trial court cannot challenge that action on appeal. (*Nevada County Office of Education v. Riles* (1983) 149 Cal.App.3d 767, 779 [defendant held to have waived right to attack trial court's decision by expressly agreeing to trial court action it objected to on appeal].) The appellant may also waive a claim of error by any other action, short of an express waiver, that demonstrates his acquiescence in the trial court's action. (*Sperber v. Robinson* (1994) 26 Cal.App.4th 736, 742-743). The record here also supports the conclusions that Father expressly waived his jurisdictional claim by agreeing to try the school choice issue or by acquiescing in the procedure whereby the court decided the issue.

have noted, although Father had several opportunities to object that the court did not have the power to decide which school Child should attend or to argue that the court could only decide which parent would pick the school, he never objected. Father is therefore estopped from challenging the trial court's order as one made in excess of jurisdiction.

In his opening brief, Father relies on the following language from California Child Custody Litigation and Practice (Cont.Ed.Bar 2011) section 4.29, page 122, which is in the chapter on parenting plans: "A parenting plan must clearly allocate decision-making authority, describing what power each parent has when acting alone and what decisions must be made jointly. Nothing in the Family Code gives the court the power to make decisions for the child, yet courts . . . frequently make orders choosing, e.g., schools, therapists, and health care providers. Such orders exceed the court's jurisdiction. The better practice, *absent stipulation of the parents*, is for the court order to determine which parent has the authority to make the decision, rather than what decision is made." (Italics added.)

We begin by noting that this treatise passage does not contain any citations to primary authority. After Mother's attempts at mediating the dispute failed and after obtaining an assessment, Mother and Father could not agree on the choice of schools and submitted their dispute to the court for decision. In our view, that was a stipulation that the court decide the school issue within the meaning of the treatise passage. As we have noted, the court set the matter for an evidentiary hearing, Father submitted a trial brief setting forth his view of the case, presented evidence for two days, and asked the court to decide the issue. Father cannot now complain that the court exceeded its jurisdiction when it made exactly the decision Father asked it make.

### The Court Did Not Err in Applying the Best Interest Test

Father contends the court abused its discretion because it applied the wrong legal standard when it decided the school choice question. He contends the court should have

applied the "compelling circumstances" test articulated in *In re Marriage of Williams* (2001) 88 Cal.App.4th 808 (*Williams*) and applied in *In re Marriage of Heath* (2004) 122 Cal.App.4th 444 (*Heath*), instead of the "best interests of the child" test, when it ordered that Child attend a different school from Half Brother.  We disagree.  In examining this question we will discuss three tests:  (1) the compelling circumstances test; (2) the best interests of the child test; and (3) the changed circumstances test.

The court addressed the question of the proper test to apply in visitation and school choice cases in *Enrique M*.  The father in *Enrique M*. had argued that the court erred when it applied the changed circumstances test rather than the best interests of the child test.  The appellate court agreed.  The court explained, " 'In making an initial custody determination, the court must make an award that is in accordance with the best interests of the child.' (*In re Marriage of Loyd* (2003) 106 Cal.App.4th 754, 758 . . . , citing *Burchard v. Garay* (1986) 42 Cal.3d 531, 535 . . . ; Fam. Code, § 3040.)  In *Burchard v. Garay*, *supra*, 42 Cal.3d at page 535, the California Supreme Court explained that the changed circumstance rule is an adjunct to the best interest test in the context of requests to modify custody:  'In deciding between competing parental claims to custody, the court must make an award "according to the best interests of the child." [Citation.]  This test, established by statute, governs all custody proceedings.  [Citation.] The changed-circumstance rule is not a different test, devised to supplant the statutory test, but an adjunct to the best-interest test.  It provides, in essence, that once it has been established that a particular custodial arrangement is in the best interests of the child, the court need not reexamine that question.  Instead, it should preserve the established mode of custody unless some significant change in circumstances indicates that a different arrangement would be in the child's best interest.  The rule thus fosters the dual goals of judicial economy and protecting stable custody arrangements.  [Citations.]' " (*Enrique M*., *supra*, 121 Cal.App.4th at pp. 1378-1379.)

19

"The California Supreme Court has repeatedly discussed the changed circumstance rule in cases involving requests to modify custody, where granting the request would remove custody from one parent and give it to the other parent. (E.g., [*In re Marriage of LaMusga* (2004)] 32 Cal.4th [1072,] 1081, 1088-1089 [discussing changed circumstance rule where noncustodial parent sought custody of children due to custodial parent's impending move from California to Ohio]; *Montenegro*, *supra*, 26 Cal.4th at pp. 253-254, 256 [discussing changed circumstance rule where parents sharing joint physical custody each sought sole physical custody of child]; [citation]; *Goto v. Goto* (1959) 52 Cal.2d 118, 122 . . . ['A showing of changed circumstances is required to support an order changing custody' from one parent to the other].)" (*Enrique M.*, *supra*, 121 Cal.App.4th at p. 1379, italics omitted.) But the mother in *Enrique M.* had not cited, and the court's research had not uncovered, "any published California case in which a court has held that the changed circumstance rule applies to a request to modify the allocation of parenting time, where a preexisting joint custody order was in place and custody was not at issue." (*Ibid.*)

*Enrique M.* relied on *Birnbaum*, *supra*, 211 Cal.App.3d at page 1513, which "expressly held that where a court's order does not change *custody*, but rather alters a *parenting schedule*, the changed circumstance rule does not apply." (*Enrique M.*, *supra*, 121 Cal.App.4th at p. 1379; italics in original.) In *Birnbaum*, the parents initially shared legal and physical custody of their children. During the school year, the mother had the children during the week, and the father had the children on weekends and Wednesday afternoons. After the mother moved to another community, both parents moved for sole physical custody. The trial court maintained the joint custody arrangement, but ordered that the children reside with the father during the week for three of every four weeks, and with the mother only on weekends and Wednesday nights. (*Birnbaum*, *supra*, 211 Cal.App.3d at p. 1513.) The trial court also ordered that the children attend the father's choice of schools. (*Ibid.*) On appeal, the mother argued that the trial court had erred in

20

failing to require the father to demonstrate changed circumstances. The appellate court concluded that the father was not required to demonstrate changed circumstances because there had been no change of custody. The parents continued to have joint legal and joint physical custody of their children; at most there had been a change in the parties' " 'co-parenting residential arrangement.' " (*Ibid.*)

In *Enrique M.*, the parties had stipulated to joint physical custody and the court had entered an order for joint legal custody. (*Enrique M.*, *supra*, 121 Cal.App.4th at p. 1382.) Following *Birnbaum*, the *Enrique M.* court held that the father's "requests to alter the parenting schedule and the [child's] school situation did not amount to a request to modify the joint custody arrangement" and concluded that the trial court had erred in applying the changed circumstances test to the father's requests in that case. (*Ibid.*)

As in *Birnbaum* and *Enrique M.*, in this case, Mother and Father did not seek to alter their existing joint legal custody order.[14] Rather, they stipulated to the change in the visitation schedule recommended by Leavy. The trial court made no orders regarding custody. Since the order resolved only the school choice issue and did not order any change in the parties' joint custody arrangement, under *Birnbaum and Enrique M.*, the court did not err in applying the best interest of the child test.

With this authority in mind, we turn to Father's contention that the court should have applied the "compelling circumstances" test from *Williams* and *Heath* when it decided that Child would not attend the same school as Half Brother.

*Williams* involved custody proceedings between divorced parents who had four children ranging in age from three to 10. (*Williams*, *supra*, 88 Cal.App.4th at p. 809.) After the parents separated, they entered into a joint legal and physical custody arrangement whereby the children remained together and each parent had custody of all

---

[14] Under section 3003, " 'Joint legal custody' means that both parents shall share the right and the responsibility to make the decisions relating to the health, education, and welfare of a child."

21

the children during alternate weeks. (*Id*. at pp. 810, 812.) When the mother remarried and moved from California to Utah, she sought primary custody of all of the children. (*Id*. at pp. 809-810.) The family court found that both parents were equally qualified caretakers, and decided to give two children to the father and two to the mother, without any consideration of the relationships among the children. (*Id*. at pp. 811, 812-814.) The Court of Appeal reversed, stating: "Children are not community property to be divided equally for the benefit of their parents. . . . The children have not chosen to divorce each other. At a minimum, the children have a right to the society and companionship of their siblings. [Citation.] We can envision a case in which an extraordinary emotional, medical or educational need, or some other compelling circumstance, would allow the separation of siblings. But here, there is no evidence of the impact that separation will have on these children. In the absence of such evidence, we cannot affirm the family law court's order even on the deferential abuse of discretion standard." (*Williams*, *supra*, 88 Cal.App.4th at p. 814.) The court observed that "[n]o published California opinion has sanctioned a custody order which, in essence, divorces children from each other." (*Ibid.*; but see *In re Marriage of Schwartz* (1980) 104 Cal.App.3d 92 [trial court abused its discretion when it modified a joint custody agreement under which son lived with the father and daughter lived with the mother and instead awarded custody of both children to the mother because court's ruling was based on a preexisting bias against the split-custody arrangement, rather than on the evidence adduced].) After surveying the law in other jurisdictions, particularly Florida, the *Williams* court held that on remand, "the family law court may only order a separation of siblings upon a showing of compelling circumstances." (*Williams*, at pp. 814-815.)

In *Heath*, the parents of two young boys separated when the boys were one and three years old. (*Heath*, *supra*, 112 Cal.App.4th at p. 447.) Initially, the parties stipulated that the mother would have primary physical custody of both boys. After the mother moved to another county, the father petitioned for sole legal and physical custody.

Although the parties initially stipulated that the boys should remain together, the father later argued that they should be separated because the younger child was mimicking his brother's autistic behavior. The mother disputed that fact. (*Id.* at pp. 447-448.) The trial court awarded custody of the older child to the mother and custody of the younger child to the father and established a visitation schedule. The mother appealed. (*Ibid.*)

Relying on *Williams*, the appellate court in *Heath* held that the sibling relationship deserves strong protection and that the trial court had failed to recognize the children's "interest in having a meaningful opportunity to share each other's lives or the potential detriment of their separation." (*Heath*, *supra*, 112 Cal.App.4th at p. 450.) The court observed that the record was silent on the relationship between the brothers, the true impact of the older boy's autism on the younger boy, and the impact of losing the sibling relationship. Instead of evidence, the trial court had relied on speculation by the father and the children's counsel, and its own " 'hunch' " about what was going on. The appellate court held that was insufficient, even under the deferential abuse of discretion standard. (*Id.* at p. 450.) The court also noted that since the trial court's order "changed an existing custody arrangement, [the] father could appropriately . . . [be] held to the burden of showing a substantial change of circumstances making modification essential to the child's welfare" and held that "[e]ven under the lower showing allowed by the family law court, . . . , the decision here cannot stand." (*Id.* at p. 449, fn. 3.)

Father does not cite any cases that apply the compelling circumstances test to cases involving the court's resolution of a school choice issue. As the trial court observed in its order, *Williams* and *Heath* "do not address the significance of siblings attending the same school when custody is not at issue." As we shall explain, this case is also factually and procedurally distinguishable from *Williams* and *Heath*.

First, in both *Williams* and *Heath*, one of the parents sought a change in the existing custody arrangement. In contrast, Mother and Father here did not seek to change their existing joint custody arrangement, which had worked for them for a number of

years.  Although they stipulated to a change in the visitation schedule (in accordance with Leavy's recommendations), they continued to share joint legal custody, and the primary issue for the trial court was the choice of school.

Second, unlike *Williams* and *Heath*, this case does not involve siblings who live together all or a majority of the time.  Child and Half Brother were accustomed to living together approximately half time, since the parties' custody arrangement and visitation schedule had provided for nearly 50/50 visitation for a number of years.  Before the evidentiary hearing, the boys lived together only half time, whenever Child was with Father.  That arrangement did not change after the court issued its order resolving the school choice issue.

Third, in both *Williams* and *Heath*, there was no evidence that addressed the effect of separating the siblings.  In contrast, substantial evidence supports the trial court's conclusion that the half brothers in this case, separated by six grades, would not spend substantial time together at the same school.  The younger children at LCS did not play on the same playground as the older children, and the classroom mentoring elective was only available to Half Brother during one trimester of the school year.  Moreover, Half Brother will be in high school during the 2014-2015 school year.

We hold that the trial court did not abuse its discretion when it rejected Father's contention that the compelling circumstances test applied, or when it applied the best interest of the child test in accordance with *Enrique M*.

*Admission and Exclusion of Evidence*

Father contends the trial court abused its discretion in several rulings regarding the admission and exclusion of evidence, including when it (1) prohibited questions about the timing of Mother's July 2011 ex parte application; (2) admitted evidence regarding Father's residential addresses and unemployment; (3) excluded evidence about Mother's poor parenting skills; (4) excluded a video of Child at Father's preschool; (5) relied on

24

facts not in evidence; and (6) allowed Mother's counsel to ask questions about whether alleged felons volunteer at LCS and about Half Brother hitting Child. Although Father asserts these claims, he does not, for the most part, argue how each error was prejudicial. Instead, he contends the "cumulative effect of the errors created a trial that was fundamentally unfair."

**Standard of Review**

We review the trial court's decisions on the admissibility of evidence, including the relevance of proffered evidence, for an abuse of discretion. (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 281 (*Shaw*).) Under that standard, the appropriate test is whether the trial court exceeded the bounds of reason, all circumstances before it being considered. (*In re Marriage of Connolly* (1979) 23 Cal.3d 590, 598.) Appellate courts will disturb discretionary trial court rulings only when there is "a clear case of abuse" and "a miscarriage of justice." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 331.)

**The Timing of Mother's Ex Parte Application**

Father contends the trial court abused its discretion when it prohibited his counsel from asking questions about the parties' initial agreement to mediate the school choice question and the procedure by which Mother obtained an ex parte order that Child attend TPS. Father argues that Mother's filing of the July 26, 2011 ex parte application shows her "malintentions and her inability to co-parent," and if he had been allowed to present evidence about the "surreptitious[]" procedure Mother used, the court would not have found that Mother was in the best position to provide the support Child needs at this stage of his academic career.

When Father's counsel attempted to question Father about the parties' e-mails about mediating the school choice issue, the court inquired about the relevance of that testimony. Father's counsel said "It has to do with how the child ended up at [TPS]."

25

The court responded, "I understand how the child ended up at [TPS]. I ordered the child to go to [TPS]. [¶][¶] . . . I really would like you to focus on the school." The court's order after hearing accurately describes the proceedings that led up to the evidentiary hearing.

We find nothing wrongful, unreasonable, or surreptitious about Mother's July 26, 2011 ex parte application. When she filed both her noticed motion and the ex parte application, Father had counsel of record. Neither Father nor his attorney took any steps to advise opposing counsel or the court that Father was self-represented. And since Father refused to disclose his address, Mother could not serve him with the moving papers. When neither Father nor his counsel appeared for the hearing on the noticed motion, Mother did not take advantage of the situation. Instead, her counsel advised the court that she was surprised that she had not heard from Father's counsel and that Father and his attorney had always appeared before. All the court did that day was order an assessment and set the matter for receipt of the assessor's report the week before school started. When Mother attempted to schedule the assessment, she learned that the court-appointed assessor had a conflict and returned to court for an ex parte order a few days later appointing a different assessor. At that point, Father's counsel was still counsel of record. And time was of the essence, since school started in less than a month. As a practical matter, a decision had to be made about which school Child was to attend in the event the assessment was not completed before school started or if the parties did not agree with the assessor's recommendations.

For these reasons, we hold that the court did not abuse its discretion when it excluded evidence regarding the timing of Mother's ex parte application.

**Father's Residential Addresses and Unemployment**

Father contends the court abused its discretion when it admitted evidence regarding his home addresses and employment status because it was irrelevant to the

26

issue of school choice. The court said it was interested in establishing whether Father had a permanent address because he had a history of moving around that was relevant to his stability.

Generally speaking, continuity and stability are important factors when determining the best interests of the child. (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32-33.) During the first two years of Child's life, Father moved from Salinas to Gilroy to Watsonville. After moving to Watsonville, Father lived at four different addresses in that city, and Half Brother attended four different schools by the time he was in the fourth grade. When Father balked at the questions about his addresses, Mother's counsel asked for just the street names. Thus, these questions were designed to establish that Father's housing situation changed often. Since a move may result in a change of school or school district, the parents' addresses were relevant to the school choice question. There was no abuse of discretion in permitting this line of questioning.

The court's order notes that Father "is presently seeking employment" and that Mother "does not work." Father argues "the comparable income or economic advantage between parents is not a proper basis for awarding custody." But in this case, the court did not alter the parties' custody arrangement, it decided which school Child would attend. And apart from noting that neither parent worked outside the home, the court did not inquire into their economic status. We find no abuse of discretion.

### Evidence of Mother's Alleged "Poor Parenting Abilities"

Father contends the court abused its discretion when it excluded evidence of Mother's "poor parenting abilities." In the testimony at issue, Father's counsel asked Father whether the parents at LCS know and work with the other parents' children. Father responded with a long narrative that answered the question, complained of how Caballo responded to his concerns about Child's behavioral issues, and then criticized Mother's handling of a different behavioral problem. After permitting about three

minutes of testimony, the court stated, "I'd like to go back and focus on the school. Again, there is no issue here about the parenting skills of the other parent." This was not an abuse of discretion. Father's answer did not respond to the question. Furthermore, Leavy had reported that both parents were good parents who were concerned about Child's education.

**Video of Child at Father's Preschool**

Father contends the trial court abused its discretion when it excluded a video of Child sitting in his class at Father's Preschool, listening to the teacher. Father offered the video to demonstrate that the half brothers were bonded and how they act together. When the court questioned him about the video, Father testified that although Half Brother was watching the preschool activity, he was not depicted in the video. Since Half Brother was not in the video, the court excluded it on relevancy grounds. Since the video did not depict the boys together, we conclude the court did not abuse its discretion when it excluded the video.

**Facts Not in Evidence**

Father contends the trial court erred because its order made two statements that relied on "facts not in evidence." First, he contends the court erred when it referred to Child and Half Brother as "step brothers." Father argues that they were "blood brothers," not step brothers, and that the court's "assertion" that they were step brothers "was a fact not in evidence." Second, Father contends the court erred when it "asserted" that Parents shared joint legal and physical custody. Father argues that at the December 2009 "review hearing" the court "made it abundantly clear that [Father] retained <u>sole physical custody</u> . . . ." (Underscore in original.)

As for the court referring to Father's sons as "step brothers," the court's order used various terms to refer to Half Brother, including his name, "stepbrother" and "older

28

brother." And the court referred to these half brothers jointly as "siblings," "brothers," Father's "sons," and by their names. It is clear from the order that the court understood these boys were both Father's sons, but had different mothers.

Although the court technically erred in describing these boys as "step brothers" rather than half brothers, the error was not prejudicial and does not require reversal. Nothing in the order suggests the court based any of its holdings on the distinction between step brothers and half brothers. "If the decision of a lower court is correct on any theory of law applicable to the case, the judgment or order will be affirmed regardless of the correctness of the grounds upon which the lower court reached its conclusion. [Citation.] [¶] The rationale for this principle is twofold: (a) an appellate court reviews the action of the lower court and not the reasons given for its action; and (b) there can be no prejudicial error from erroneous logic or reasoning if the decision itself is correct." (*Mike Davidov Co. v. Issod* (2000) 78 Cal.App.4th 597, 610.)

As for the alleged erroneous description of the court's 2009 custody order, the court's written order for the September 30, 2009 hearing provides that Parents will have both joint legal and joint physical custody. In December 2009, Parents disputed whether the court actually ordered joint physical custody in September 2009.[15] But the court also

_____

[15] The transcript of the September 30, 2009 hearing indicates that on that date, Parents stipulated to joint legal custody and agreed to continue their visitation schedule; there was no mention of "physical custody." When the parties returned to court on December 11, 2009, they entered into stipulations regarding a holiday schedule and Mother's request to travel to Mexico with Child. After the court made an order in accordance with those stipulations, it asked, "With respect to the findings and order after hearing, I believe there should be no dispute that it was not joint physical custody, correct?" Mother's counsel responded that Mother had agreed that Father would have sole physical custody in 2007 to avoid going to trial, that the parties had subsequent assessments and mediation in which the topic was never addressed, and that Mother's counsel "understood it to be joint physical," because Mother had a 46 percent timeshare. When the court asked Mother's counsel whether she would "file an amended order indicating father still has physical custody until further order of the court," counsel responded that she would file a motion. The court later stated that she expected Mother's counsel to correct the previous order. But the record does not contain any written orders

29

ordered joint legal and physical custody after the review hearing in October 2011.  And since Child shuttled back and forth between both parents each week and spent nearly equal time with each parent for a number of years, their visitation schedule amounted to joint physical custody.  (*In re Marriage of Lasich* (2002) 99 Cal.App.4th 702, 715.)  For these reasons, we hold the trial court did not err when it stated that "the parents share legal and physical custody."  Even if that statement was made in error, any error was harmless and does not require reversal.  The issue before the court was school choice.  It is undisputed that Parents had joint legal custody.  The right and responsibility to make educational decisions is an aspect of joint legal custody.  (§ 3003.)

### Offers of Proof that Felons Volunteered at LCS and that Half Brother Hit Child

Father argues that the court erred in allowing Mother's counsel to question Leavy about ex-felons who volunteered at LCS because Mother's counsel never introduced any admissible evidence to substantiate her offer of proof that at least one ex-felon volunteered at LCS.  Mother's counsel asked Leavy whether mandatory parental involvement at LCS raised any concerns "about inappropriate parents being . . . in the classroom."  Leavy said, "I imagine that they're being supervised by a teacher."  Counsel next asked, "So as long as the teacher was supervising, it would be okay to have ex-felons perhaps in the classroom?"  Father's counsel objected that the question lacked foundation; the judge asked for an offer of proof and Mother's counsel said she knew of at least one ex-felon parent who volunteered at LCS.  The court allowed further questioning and Mother's counsel asked whether persons with "shady backgrounds" could be involved in the classroom at LCS; Leavy said it was a possibility.  Leavy also

regarding the December 2009 hearing or any evidence that Mother's counsel filed an amended order for the September 2009 hearing or a motion regarding the physical custody issue.  We note also that physical custody was not adjudicated at the evidentiary hearing on school choice.

said she assumed parent volunteers at LCS were being supervised by a teacher or had "been checked out by the school."

Father's contention is without merit since Mother presented evidence that supported the offer of proof. LCS Principal Higbee testified that there was one LCS parent with a felony conviction who volunteered in the classroom, but was "well-supervised." Mother testified that she knew of one ex-felon parent at LCS and named the person.

Father makes a similar argument regarding a series of questions in which Mother's counsel asked Leavy whether her school recommendation (which was based on having the half brothers attend the same school) would be different "if that older brother abused the younger brother." Father's counsel objected that the question lacked foundation and Mother's counsel made an offer of proof that Half Brother slapped and hit Child; she also argued that the question was a hypothetical question. The court allowed further questioning and Leavy testified that such evidence would affect her opinion. That Mother's counsel later failed to or elected not to present evidence that supported her offer of proof does not mean the court erred when it allowed the initial questions. The court, as trier of fact, surely understood that counsel's questions were not evidence and was entitled to give Leavy's testimony whatever weight it deserved. There was no abuse of discretion.

**Prejudicial Effect of Cumulative Error**

Father argues that the cumulative effect of these evidentiary errors was prejudicial. We have rejected all but one of father's contentions, holding that there was no abuse of discretion or that the record does not support the contention. As for Father's assertion that the court erred when it referred to his sons as step brothers, we hold that any error was harmless. For these reasons, we reject the contention that the "cumulative effect of the errors created a trial that was fundamentally unfair."

## DISPOSITION

The court's January 17, 2012 order is affirmed.

_____
Márquez, J.

WE CONCUR:

_____
Rushing, P. J.

_____
Premo, J.